[Cite as *Blacklock v. Blacklock*, 2012-Ohio-6040.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

TAUSHA BLACKLOCK                          :

    Plaintiff-Appellant                 :    C.A. CASE NO.    25157

v.                                        :    T.C. NO.    09DR826

DAVID BLACKLOCK                           :    (Civil appeal from Common
                                                 Pleas Court, Domestic Relations)
    Defendant-Appellee                  :

                                          :

          . . . . . . . . . .

**O P I N I O N**

Rendered on the   21st   day of   December  , 2012.

          . . . . . . . . . .

CHERYL R. WASHINGTON, Atty. Reg. No. 0038012, 130 W. Second Street, Suite 445, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellant

DAVID M. McNAMEE, Atty. Reg. No. 0068582, 42 Woodcroft Trail, Suite D, Beavercreek, Ohio 45430
      Attorney for Defendant-Appellee

          . . . . . . . . . .

DONOVAN, J.

    **{¶ 1}** This matter is before the Court on the Notice of Appeal of Tausha

Blacklock,

filed April 25, 2012.   Tausha[1] appeals from the March 22, 2012 Final Judgment and Decree of Divorce ("Final Decree"), which terminated her marriage to David Blacklock.   The record reflects that the parties were married on June 28, 2003, they separated on July 10, 2009, and Tausha filed her complaint for divorce on August 3, 2009.   There were no children born of the marriage.   Tausha has two daughters from a previous relationship.

{¶ 2}   On September 30, 2009 a Temporary Order was issued pursuant to which David was required to pay $2,050.00 per month in spousal support beginning on September 1, 2009.   The order provides, "If plaintiff is residing in the marital residence, defendant shall have the right, option and privilege of discharging this monthly spousal support by paying the mortgage/rent (including taxes and insurance) and basic utilities at the marital residence.   If plaintiff is not residing in the marital residence, defendant shall pay the monthly spousal support directly to the plaintiff."   The Temporary Order provides that it is to remain in effect until the date that permanent support orders become effective.

{¶ 3}   On September 30, 2010, following a hearing to address multiple motions filed by the parties, an Agreed Order was issued which in part granted Tausha sole occupancy of the marital residence in Kettering, Ohio, provided that each party withdrew their contempt motions, ordered Tausha to provide a list of items sold or pawned by her, as well as any documentation regarding the transactions, and referred Tausha's "Motion to Return Vehicle/Motion for Replacement Vehicle" to the Magistrate for hearing.

{¶ 4}   On October 12, 2010, after a hearing, the Magistrate issued an Order which found that Tausha's motion regarding a vehicle was well taken.   In her Decision, the

_____

[1]We will use the parties' first names to avoid confusion.

Magistrate noted that before the parties separated, they owned a 2005 Land Rover and a 2008 Land Rover. In July, 2009, David "caused the 2008 Land Rover to be traded in on a 2006 Land Rover purchased in his father's name." The Magistrate noted that David was ordered, in July, 2009, pursuant to an ex parte Civil Protection Order, to return the 2005 Land Rover to Tausha. After giving Tausha the vehicle, David ceased making the car payments and the loan at the time of the hearing was in default. The Magistrate further noted that David "obtained an Order filed on September 13, 2010, for [Tausha] to return the 2005 Land Rover" to him, and that at the time of the hearing, she had not done so. The Magistrate noted Tausha's testimony that she "could not pay for a car because [David] had not paid on the temporary support order." The Magistrate noted that David was living rent free in his parents' home and had no car payment, and that Tausha lacked transportation and had been borrowing vehicles from friends since "she heard the 2005 Land Rover was in default and that the bank was looking for it." The Magistrate ordered that David's temporary spousal support obligation be increased in the amount of $400.00 per month, to assist Tausha with transportation expenses.

{¶ 5} On October 18, 2010, David filed a "Motion for Contempt" regarding the return of the 2005 Land Rover, and on October 19, 2010, he filed a "Motion to Set Aside Magistrate's Order" of October 12, 2010. On November 18, 2010, Tausha filed a "Motion for Interim Attorney Fees," which David opposed. On November 24, 2010, David filed a "Motion for Hearing on Temporary Order." On December 2, 2010, the court ordered David to pay interim attorney fees to Tausha in the amount of $1000.00, within 30 days of the filing of the order.

**{¶ 6}** On December 23, 2010, David filed a "Motion for Exclusive Use" of the marital residence. On February 23, 2011, Tausha filed a "Motion to Show Cause" based upon David's failure to adhere to the temporary orders by allowing electric service at the marital residence to be disconnected, as well as his failure to pay attorney fees. On March 24, 2011, David filed a "Motion for Hearing on Temporary Order," specifically seeking an order that Tausha be responsible for the utilities at the marital residence. On May 4, 2011, Tausha filed a "Motion for Emergency Hearing for Non-Payment of Electrical Service and Notice of Hearing."

**{¶ 7}** On May 12, 2011, after a hearing, the Magistrate issued an Order, noting in part that there had been no electric service at the residence since April 18, 2011, and that since "the temporary order was issued, the electric has been turned off four times." The Magistrate determined, through "May 2011, the temporary order of spousal support (housing) due was $43,050. The defendant paid $36,926.02. He has a deficiency of $6,123.98." David was ordered to "pay to bring the electric bill current and get it turned on, including reconnect fees up to a limit of $6,123.98," and to pay the temporary order every month. Finally, the Magistrate indicated that if the monthly amount for the mortgage, electric, trash and water exceed David's obligation of $2,050, "the defendant shall let his attorney know, who shall advise the plaintiff's attorney of the deficiency."

**{¶ 8}** On May 13, 2011, Tausha filed a "Motion for Increase in Temporary Support and Notice of Hearing." On May 26, 2011, the Magistrate issued an Order, noting that David withdrew his March 24, 2011 "Motion for a Hearing on Temporary Order." The Magistrate further noted that, as of the date of the hearing, the electric service to the home

had not been restored. After reviewing the parties' expenses, the Magistrate denied Tausha's motion for an increase in temporary support.

{¶ 9} On June 2, 2011, Tausha filed a "Second Amended Motion to Show Cause," based upon David's failure to pay the electric bill and reconnect electric service, as well as his failure to pay the vehicle allowance. On June 27, 2011, after a hearing, the Magistrate issued a Decision and Permanent Order. Therein, the Magistrate noted that electricity had been restored to the marital residence, and that David paid DP&L $2,755.84 on June 1, 2011 to reinstate service and accordingly declined to find him in contempt on that basis. The Magistrate, however, found David in contempt for his failure to comply with the temporary orders, noting that he owed an arrearage of $2,800.00 for the car allowance. The Magistrate sentenced David to two days in jail, suspended "on the condition that [he] pays the temporary support orders on time and in full in the future." Tausha was awarded $350.00 in attorney fees.

{¶ 10} On July 1, 2011, Tausha filed a "Motion for Attorney Fees and Notice of Hearing." On October 21, 2011, Tausha filed a "Motion to Show Cause" based upon David's failure to pay her attorney fees as well as "$1099.44 per month."

{¶ 11} The final hearing before the court on the parties' divorce was held on September 9, 2010, September 8-9, 2011, and October 27, 2011. David testified on cross-examination on September 9, 2010, that he has been employed at Virtalis as an engineer since July, 2009, and that his salary is $72,000.00. David stated that he is not a "degreed engineer." Prior to July, 2009, for almost a year, David stated that he operated a sole proprietorship, known as DJB Sim Consulting, providing engineering consulting

services to Flight Safety International, which is based in St. Louis, Missouri. David stated that during that time, he earned "about 2,000, 2,100 a week" but paid his own expenses. Prior to starting his consulting business, David testified that he was employed at BARCO Simulation ("BARCO") for five years, from 2004 - 2008, where he earned on average "about $66,000.00 a year." David stated that he lost his job at BARCO in July of 2008, and that he collected unemployment at that time in the amount of $416.00 a week. Contrary to his initial testimony, David then testified that he was unemployed for over a year, from July, 2008 until August or September of 2009. This discrepancy was resolved in subsequent testimony. David stated that he and Tausha purchased the marital residence in 2008, while he was employed at BARCO.

{¶ 12} David testified that he received 401(K) benefits while he was employed at BARCO. He testified that he "exhausted" his 401(k) "during my period of unemployment after I lost my job to continue our lifestyle and just pay our bills." David stated that he took approximately $28,000.00 from the 401(k) over the period of his unemployment.

{¶ 13} The following exchange occurred:

Q. Now, you agree with me when you took out that $28,000 you didn't communicate with Tausha that you were taking it out, did you?

A. I agree.

Q. * * * And you also agree with me that you determined how you were going to utilize that $28,000. Is that correct?

A. I agree.

Q. * * * You didn't consult with her regarding it, did you?

A. No, I handled all the finances.

Q. * * * Now tell the Court what you did with the $28,000.

A. Paid basic bills, mortgage on our house, car payments, food, utilities.

{¶ 14} On September 8, 2011, counsel for David represented to the court that the parties agreed that there is no equity in the marital residence, and that David "will be entitled to the home." David stated that he was unemployed between his employment at BARCO, which ended in July, 2008, until he started his consulting firm a couple of months later. David identified a "settlement statement" that indicated that he made a down payment on the home of $3,616.99, and that $171,460.95 was due on the mortgage at closing.

{¶ 15} Regarding his retirement plan at BARCO, David testified that he had "borrowed money against the BARCO retirement plan before I left BARCO," but he was unable to recall the "exact amount. I don't think I ever took out more than three, $4,000 at a time."

{¶ 16} The following exchange occurred:

THE COURT: How many times did you say you borrowed money?

THE WITNESS: I don't recall the number of times. But the way our marriage went, I was just getting hit with unexpected bills all the time and being asked for cash - - and various things constantly. So in order to keep us afloat, because the nature of my job I would have to pay expenses for my trips that I would go on, business trips, out of my pocket, and then it would take months to get paid back sometimes. So I would take some out of that to - -

to pay our bills.

* * *

THE COURT: * * * And what was the most you had in that 401(k)?

THE WITNESS: I believe 28,000.

THE COURT: What did you have in it when you left the job?

THE WITNESS: I don't recall

THE COURT: Is it all cashed out now?

THE WITNESS:   Yes, it is.

THE COURT: Was it all  - - was the 401(k) funded during the

marriage?

THE WITNESS: Yes, it was.

{¶ 17}  David identified correspondence addressed to counsel for Tausha from a human resources administrator at BARCO that provides that as of July 1, 2008, the balance of the 401(k) was $34,765.99.  The correspondence identified a loss of market value of $1,067.69, and "net activity" of $33,698.30.  The correspondence provides that as of September 30, 2008, the account had a zero balance.

{¶ 18}  David stated that after he left BARCO he rolled the account over "through Wright-Patt Credit Union" into an IRA.  The following exchange occurred:

Q.  So what happened to the money you rolled over?

A.  I used money to pay off bills, to put a down payment on the house, pay some credit cards down, to take some of the trips for my job.

When I started my own business and worked for Flight Safety, which

is located in St. Louis, Missouri, six and a half hours away, I had to have money to travel to Flight Safety to negotiate my contract and stay in a hotel and receive training. I paid that all out of pocket.

Q. Okay. So we know that the down payment on the house was about $3,000. Is that correct?

A. I believe so, yes.

Q. * * * And so the rest of that money, it's your testimony that you used it for your job and for credit card payments. Correct?

A. Job, credit card payments, giving my wife cash and - - seemed like an endless thing - - and also home improvements to the new house after the purchase as well.

Q. * * * Now you agree with me that the money - - that the account that you rolled it over to was in your name only. Correct?

A. Yes.

Q. And you're sure that was Wright-Patterson that you rolled it over to?

A. I believe so, yes.

* * *

THE COURT: How long after you rolled it over into this 401(k), whatever it was, did you cash it all out?

THE WITNESS:

I did it immediately 'cause I didn't have a job. But I didn't cash the

entire amount out. I took little bits at a time, never over $3,000 to pay the mortgage, the regular bills, to give my wife money.

* * *

THE COURT: But it was eventually all cashed out.

THE WITNESS: Yes, it was.

THE COURT: Doesn't exist at all now.

THE WITNESS: No, it doesn't.

{¶ 19} David testified that he paid a 22 percent penalty for withdrawing the money in 2008. He stated that he did not file tax returns for the years 2009 and 2010.

{¶ 20} The following exchange occurred:

Q. * * * You agree with me that the expenditures that you made from - - when you used these monies at no time did you discuss using these monies to pay the bills with Tausha. Is that correct?

A. That is incorrect.

Q. You're saying that she knew everything you were doing with it?

A. Pretty much.

She knew I didn't have a job and that's how we had to pay the mortgage because she didn't make enough money to pay the mortgage.

{¶ 21} Finally, David stated that he lives in an apartment and he pays $575.00 a month in rent.

{¶ 22} Tausha's testimony on September 9, 2010, was limited to the parties' vehicles, which are not at issue herein. On September 8, 2011, she testified on direct

examination that the only temporary support she has received was in the amount of $492.00. She stated that she borrowed $10,000 to purchase a car, that her car payment is $372.00 a month, and that she is unable to afford it. She stated that the parties purchased their home in April, 2008.

{¶ 23} The following exchange occurred:

Q. And you were aware that [David] had retirement at BARCO?

A. Yes.

Q. * * * Were you aware that he rolled over any retirement money?

A. No.

Q. * * * Did you ever have any discussion with him about the use of any retirement money?

A. No.

Q. * * * Are you aware of any bills that he would have paid sometime after July 1, 2008, using that money?

A. No.

* * *

Q. And during that period of time that he was unemployed, did you contribute more toward the household bills, or was he able to continue what he was doing?

A. Pretty much he continued doing what he was doing.

{¶ 24} Tausha stated that after David lost his job at BARCO, he was unemployed for "two or maybe three months." Tausha stated that she was working during David's

unemployment, and that he continued to pay the majority of the bills, while she paid for food and "our health insurance." She stated that in the course of her marriage, she had "a $300 credit card for like Orchard Bank," and that she was unaware of any credit cards in David's name. Tauhsa stated that she expects to have a monthly rental expense of $700.00 to $725.00 a month, and that she will have a DP&L bill at her new apartment. She stated that her car insurance is $92.00 a month. She stated that her oldest daughter is emancipated, and that her 16 year old daughter lives with her and that she does not receive child support for that child. Tausha testified that she has been employed as a teacher at Miami Valley Early Head Start for three years.

{¶ 25} On redirect examination, Tausha identified copies of her W2 for 2010, indicating gross wages of $19,284.97, and her 2009 W2, indicating gross wages of $19,455.15. Tausha stated that the parties agreed that David would retain the marital residence. Tausha stated that she has borrowed $5000 from "Payday loan" to meet her expenses.

{¶ 26} David testified on direct examination on September 8, 2011, that he does not currently have any retirement accounts. Regarding the BARCO 401(k), the following exchange occurred:

Q. * * * What happened to that retirement account?

A. I had to use the retirement account to put the down payment on our house, to pay off credit cards, to help start my business when I left BARCO. I gave my wife and kids a lot of that as well.

Q. Did you have to pay off any debt before you even qualified for

your mortgage?

A. Yes, I did.

Q. How much was that?

A. Around $18,000.00.

Q. And the retirement account was exhausted when?

A. Had to be around the time that I started with Flight Safety when I had to start my own company, 'cause I didn't have much left in there.

Q. Earlier you testified that you paid a penalty for that on your 2008 tax return. Is that correct?

A. That's correct.

Q. Does that seem that's when that would have been exhausted?

A. I believe so.

{¶ 27}   David stated that the monthly mortgage payment on the marital residence is $1,373.12.

{¶ 28}   David identified American Express credit card statements in the name of his father, Raymond Lee Blacklock.  David testified, "I was a cosigner on the credit card so I could have my own charge card and charge whatever I needed to."  David testified as follows:

I used this card for work.  I used it for home improvements after we bought the house.  I bought all new appliances, toilets, electrical, you name it.

I used it to pay bills.  I used it to take my family out to eat.  I used it

to buy gas, groceries.   I used it for everything.

And the sole reason for establishing this card was because I had so much stuff in my name I couldn't get a credit card with this high of a limit, and I had to have a credit card with a high limit so I could work because I travel.

David stated that the card was opened in 2006, that the balance is $34,656.93, and that the monthly payment, which he makes, is $1,400.00 a month.   David argued that the balance due on the card "most certainly is marital debt."

{¶ 29}   Regarding spousal support, based upon the amount of temporary support that he paid, David stated that he "paid well in excess what should have been required for a relatively short marriage," and he asked that the court not order ongoing spousal support.

{¶ 30}   On recross-examination, David identified the parties' 2008 joint tax return that reflected an adjusted gross income of $105,457.00, as well as an IRA distribution of $25,070.00.   Regarding the difference between the approximate amount of $33,000.00 to which David previously testified, the following exchange occurred:

Q.   So I'm asking you what happened to the other 8,000.

A.   It went the same place that the other 25,000 went.   It went to family expenses.   And paying off bills.

* * *

THE COURT: So you're saying that other $8,000 was used in 2009?

THE WITNESS: Yes, your Honor.

* * *

Q. * * * Now, you indicated that you had some bills that you had to pay in order to qualify for the loan.

A. That's correct.

Q. And what bills did you pay?

A. I paid some credit cards.

Q. * * * What credit cards?

A. I had a Sears charge card. A lot of these are bills that I accumulated in college when - - that I didn't even know I owed still.

Q. * * * So these were - - these were bills that were your bills.

A. I would say one of them was, yes.

Q. Okay. So you have a Sears bill.

A. Yes.

Q. * * * What else?

A. I really don't - - know all the debt names. They were all fairly old.

Q. And separate?

A. I would say the Sears is the only one that's separate.

* * *

Q. I'm trying to find out what debt you paid off. So the Sears bill - -

* * *

A. I don't have that information. I'm sorry.

Q. * * * Don't know who you paid. You don't know what amounts you paid individually?

A. I don't have that information. I do remember the total.

* * *

Q. And you never provided me with any documents, receipts, evidencing any bills that you had to pay to qualify for a loan, have you?

A. I'm not sure what I've sent you. I really don't know.

* * *

THE COURT: * * * I'm looking at this from another standpoint. The mortgage is in your name only. So in order for you to get credit for the mortgage, you had to pay off bills that were in your name, that you were responsible for.

THE WITNESS: Yes, your Honor.

THE COURT: You didn't pay off any of Mrs. Blacklock's debts, did you? Because she wasn't a cosigner on that mortgage.

THE WITNESS: On paper? No. But she was a part of that debt. Just like the house is in my name, she lives at the house.

{¶ 31} Regarding the American Express card, David denied that he is the "additional card member" on his father's account, and he stated, "I have the same access to everything he does." David testified that Tausha "[m]ost certainly" knew about the American Express Card. David stated that he used some of the money from his 401(k) to service the American Express debt, and that it "is the credit card I used when I was unemployed; that was the credit card that had the largest amount and I had to fund it

somehow because I only got $425 a week from unemployment."

**{¶ 32}** David admitted that he charged $6,885.55 on the American Express card between June 14, 2008 and July 14, 2008, and the following exchange occurred:

Q. And let's look at these charges. Wal-Mart, Kroger fuel, Roll at the Greene, Auto Zone, Radio Shack, LaRosa's, i-Tunes, City Barbeque, The Hobby Shop, Arby's, Taco Bell, Fricker's, Amber India. All those charges seem to be pretty - - I don't know, not exorbitant, but when you don't have a job, it seems to me like you'd have been a little bit more frugal about how you spent your money.

A. Well, I wanted to maintain our lifestyle, and I wanted my family to not be affected, and I had the money there, and we talked about it. And she didn't make enough money to cover the regular bills, so we did what had to do to survive at that point in time.

Q. Okay. You did it for the next month. $4, 919.86 worth of the same type of charges. You agree?

A. I agree. I totally agree. Walgreen's, Fazoli's.

Q. McDonald's.

A. Fuel. It's expensive to have a family.

Q. * * * Next statement is 9,000 for that month. * * * You had Wal-Mart in South Carolina.

A. That was a family vacation.

* * *

Q. There's a lot of charges for Missouri. What was happening in Missouri?

A. That's where Flight Safety was.

Q. So all those charges for Missouri would be related to your job?

A. Right.

Q. And you should have gotten reimbursed for all those charges.

A. Not true.

* * *

THE COURT: Why weren't you reimbursed?

THE WITNESS: Because, when you own your own consulting business and you don't actually - - you're not actually employed by the company, I had to pick up all my own travel expenses.

{¶ 33} David identified all of the invoices that he submitted to Flight Safety International, from October 30, 2008 through July 3, 2009. He denied that during his period of unemployment that he had sufficient income to maintain his family's lifestyle.

{¶ 34} On redirect examination, on September 9, 2011, David stated that the unemployment benefits he received were "substantially less" than the income he earned while employed, and he agreed that he and Tausha lived well beyond their means by using the American Express card and depleting his 401(k).

{¶ 35} On October 27, 2011, David testified that his monthly expenses include rent of $575.00, $250.00 for "Internet, Vectren and DP&L," $280.00 for cell phones for himself, his step-daughters and his parents, $190.00 for car insurance, a car payment of $836.00, $250.00 - $300.00 for gas, and $300.00 for food, as well as the American Express

bill of $800.00.

**{¶ 36}** On October 27, 2011, Tausha testified that she has taken "out loans from buy-here/pay-here places, from Check-N-Go, Cash-net USA," and that "[t]hey take three hundred dollars out of my check every two weeks * * * which leaves me two hundred and some dollars to the next paycheck and they do it all over again."

**{¶ 37}** On November 8, 2011, the court issued a Decision resolving the issues contested at the final hearing. On February 21, 2012, the Magistrate issued a Decision, following a hearing, on Tausha's motion of October 21, 2011. The Magistrate found David in contempt for failure to comply with the temporary orders, noting that David was found in contempt for the second time. The Magistrate noted that the Montgomery County audit, as of October 31, 2011 indicated that David was in arrears in an amount of $7,478.60, and the Magistrate further noted that David never paid the $400.00 car allowance or the attorney fees awarded in the last contempt hearing. The Magistrate sentenced David to 10 days in jail, suspended on the condition that he pay the temporary support arrearages and attorney fees previously awarded on or before March 15, 2012. The Magistrate awarded Tausha $350.00 in attorney fees and set the matter for imposition of sentence on April 23, 2012.

**{¶ 38}** On March 20, 2012, David filed a "Motion to Vacate Hearing," asserting that he purged the finding of contempt by paying the temporary spousal support and $350.00 in attorney fees. The trial court granted the motion and purged the finding of contempt.

**{¶ 39}** The Final Decree, filed March 22, 2012, provides in relevant part:

    1. Spousal Support

    Plaintiff is requesting spousal support. Plaintiff has a gross annual

pay of $24,823.50 from her employment at Miami Valley Early Childhood Development Center. Defendant is employed by Virtalis and earns approximately $72,000.00 per year. He is reimbursed for certain operating expenses. Plaintiff testified concerning her monthly expenses, particularly a need to find new housing. * * * It is the order of the Court that the Defendant pay to the Plaintiff the sum of Seven Hundred ($700.00) Dollars per month as spousal support for two (2) years commencing the first month after filing of the final decree. * * *

* * *

4. Pension/Retirement Accounts

During the course of the marriage the Defendant was employed by Barco and accumulated a 401(k) of approximately $27,000.00. Defendant worked for Barco for five (5) years, and was fired from Barco in July, 2008. He subsequently received unemployment compensation of approximately $416 per week. From late October of 2008 to July 2009, he was self-employed as DJB SIM Consulting, charging his clients $56.00 per hour. Expenses were not detailed. The Defendant has been employed with his current employer, Virtalis, since July, 2009, approximately the time of the separation of the parties. * * * Therefore, it is determined that two years of the 401(k) from Barco was marital, and three years were non-marital. Since Defendant cashed out the 401(k) to pay marital bills such as the house mortgage, utilities, credit cards, etc., the evidence is therefore insufficient to

award Plaintiff any amount of the Barco 401(k).

5. Individual Debts

Plaintiff has an Orchard Bank credit card in her name, and she shall be solely responsible for the credit card. Defendant claims that the American Express credit card is a marital debt, and in lieu of requiring Plaintiff to pay half of the debt, he appears to be requesting a credit against any monies he may owe to the Plaintiff. After careful review of the American Express credit card statements from mid to late 2008 through October, 2009, the court finds that the balance on the card consistently remained about $30,00.00. The charges on the card are for various things, including many out-of-state charges which the court would have to presume are related to Defendant's business and may have been reimbursed to him by his employer. Further, the card appears to be in the name of Ramon Blacklock, Defendant's father, and that all of the account activity is attributed to Defendant's father. It is conceded that Plaintiff never had any access to the American Express card. The court therefore finds that Plaintiff has no responsibility for the American Express credit card, and it shall be the responsibility of Defendant under whatever terms and conditions that exist between him and his father.

{¶ 40} The Final Decree indicates that David testified on October 27, 2011, that he had received all of the personal property that he wanted from the marital residence, and that the remaining property in the residence was awarded to Tausha. Finally, the court ordered David to pay Tausha an additional sum of $3,000.00 in attorney's fees.

{¶ 41} Tausha assert two assignments of error. We will first consider her second assignment of error, which is as follows:

{¶ 42} "THE COURT'S FAILURE TO AWARD APPELLANT A SUFFICIENT PORTION OF APPELLEE BLACKLOCK'S RETIREMENT, AND FAILURE TO AWARD RETIREMENT INTEREST, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AN ABUSE OF DISCRETION."

{¶ 43} Tausha asserts that she is entitled to an "equitable distribution" of the proceeds of David's 401(k), along with interest. David responds that he "lost his job and thus drastically reduced his income. Instead of adjusting their lifestyle, the parties depleted Appellee's retirement and incurred massive credit card debt. Appellee's retirement account was disposed of to support the parties while the Appellee was out of work. It no longer exists for that reason."

{¶ 44} "Under R.C. 3105.171(C)(1), the court is to divide marital property equally, unless an equal division is inequitable. Trial courts have broad discretion in deciding appropriate property awards, and we reverse only if the trial court abuses its discretion. * * * ." *Donnelly v. Donnelly*, 2d Dist. Green No. 2002-CA-53, 2003-Ohio-1377, ¶ 38.

{¶ 45} As the Supreme Court of Ohio determined:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. (Internal citation omitted). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that

would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶ 46}** R.C. 3105.171(A)(3)(a)(i) defines marital property to include: "All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage." "During the marriage"means "the period of time from the date of the marriage through the date of the final hearing in an action for divorce," except that if the court determines that either of those dates "would be inequitable, the court may select dates it considers equitable in determining marital property." R.C. 3105.171(A)(2). Additionally, if a party has engaged in financial misconduct, including the dissipation, concealment or nondisclosure of assets, the court may compensate the other party with a distributive award or a greater share of marital assets. R.C. 3105.171(E)(4).

**{¶ 47}** As indicated above, the parties were married on June 28, 2003, they separated on July 10, 2009, and their divorce became final on March 22, 2012. Since David was employed by BARCO and earning his 401(k) benefits from 2004 - 2008, in the course of the parties' marriage, we conclude that the court erred in determining that "three years were non-marital". Any error, however, is harmless. Although David's testimony is somewhat inconsistent regarding Tausha's knowledge of his use of the 401(k) to pay their bills, the trial court clearly credited David's testimony that he used the money to pay marital expenses, and we defer to the trial court's

credibility assessment. *Rambo v. Rambo*, 2d Dist. Montgomery Nos. 19334, 19336, 2002-Ohio-6382, ¶ 34. Further, Tausha testified that in the course of their marriage, David paid the majority of their bills, and she only paid miscellaneous expenses, and that he continued to do so after he lost his job at BARCO. The parties' 2008 joint tax return reflects an IRA distribution of $25,070.00, and we note that 22 percent of $33,000.00, which is the penalty David stated he paid for withdrawing the money from the 401(k), is over seven thousand dollars. Finally, David testified that the account was depleted in 2008, while the parties were still married. Since the retirement account was exhausted prior to the parties' divorce, the asset was not subject to division because it was not property or an interest in property which either party "currently" owned. Also, no financial misconduct or dissipation of marital assets was established.

{¶ 48} Since an abuse of discretion is not demonstrated, Tausha's second assigned error is overruled.

{¶ 49} Tausha's first assigned error is as follows:

"THE COURT'S AWARD OF SPOUSAL SUPPORT WAS INADEQUATE, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND AMOUNTED TO AN ABUSE OF DISCRETION."

{¶ 50} According to Tausha, "the Court insufficiently considered the relative assets and liabilities of the parties in making its temporary spousal support judgment. See R.C. 3105.18(C)(1)(i)." Tausha asserts that her standard of living is "far below the elevated standard of living established during the parties' marriage." She cites David's failure to provide court ordered temporary support, an existing arrearage, and her "inability to meet her financial obligations without borrowing money and very high interest rates" as the cause of "the systematic

destruction"of her finances.

{¶ 51}   David responds that the the parties' "marital lifestyle was funded with credit cards," and that their "marital lifestyle was not based upon their income, but their credit limit." David asserts that much of the parties' expenses were paid for with the American Express card, the balance of which is his responsibility.   Finally, David asserts that he "paid temporary spousal support at the rate of $2,050.00 for a period of 29 months."

{¶ 52}   "Domestic relations courts are granted broad discretion concerning awards of spousal support, and their orders will not be disturbed on appeal absent an abuse of discretion. (Internal citations omitted)."   *Perry v. Perry*, 2d Dist. Clark No. 07-CA-11, 2008-Ohio-1315, ¶ 5.

{¶ 53}   R.C. 3105.18(C) provides:

(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be

inappro

priate

for a

party,

becaus

e

that

party

will be

custodi

an of a

minor

child of

the

marria

ge, to

seek

employ

ment

outside

the

home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of the education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

(2) In determining whether spousal support is reasonable and in determining the amount and terms of payment of spousal support, each party shall be considered to have contributed equally to the production of marital income.

**{¶ 54}** Having thoroughly reviewed the record, we conclude that the trial court

properly considered "the relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties." Both parties itemized their income and monthly expenses in detail. Further, David was ordered to pay $2,050.00 per month in temporary support, beginning September 1, 2009, and continuing until the date that permanent support orders became effective. That amount was increased on October 12, 2010 by $400.00 a month to assist Tausha with transportation expenses, and the order remained in effect until the Final Decree was issued, on March 22, 2010. As he asserts, David was subject to the temporary orders for a period of 29 months. We agree with David that the parties' standard of living, as evidenced by the charges on the American Express statements, as well as the depletion of the 401(k) account, was beyond their means. Further, David is solely responsible for the American Express charges in excess of thirty thousand dollars, and his liabilities accordingly far exceed Tausha's. Finally, the parties' marriage was of fairly short duration. We cannot conclude that the trial court abused its discretion in awarding Tausha spousal support of $700.00 a month for two years.

{¶ 55} Since the trial court did not abuse its discretion in awarding spousal support to Tausha, her first assigned error is overruled.

{¶ 56} The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and FROELICH, J., concur.

Copies mailed to:

Cheryl R. Washington
David M. McNamee
Hon. Timothy D. Wood